**Elbert B. POPPELL, Plaintiff–Appellee,**

v.

**CITY OF SAN DIEGO; Sharren Carr; Chris Larson; Donald Albright, Defendants–Appellants.**

No. 96–56844.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 1998.

Decided July 10, 1998.

Michael R. McGuinness, Deputy City Attorney, Office of City Attorney, San Diego, CA, for defendants–appellants.

Michael R. Marrinan, Law Offices of Adler & Marrinan, San Diego, CA, for plaintiff–appellee.

Before: WALLACE, TROTT and HAWKINS, Circuit Judges.

TROTT, Circuit Judge:

## I

## Overview

Elbert Poppell, the operator of a private membership nudist club, filed a civil rights action pursuant to 42 U.S.C. § 1983 coupled with supplemental state tort and constitutional claims against the City of San Diego and various of its employees. Poppell contended as the gravamen of his civil rights claims that Zoning Administrator Sharren Carr and the City of San Diego selectively, punitively, and maliciously had caused him on an earlier occasion to be prosecuted by the San Diego City Attorney for zoning code violations. As a result of this criminal prosecution, Poppell was convicted of the strict liability offense of operating and maintaining an adult entertainment establishment in an area not zoned for such use, and of related misdemeanors. Poppell's convictions were affirmed by the state appellate courts, but subsequently overturned on habeas corpus review by a federal district court. No federal appeal was taken by the City, and because his business was inactive, Poppell was not retried. The jury in Poppell's current civil rights case from which this appeal is taken found appellants to be liable and denied appellant Carr the defense of qualified immunity as to the § 1983 claim.

The district court had jurisdiction over Poppell's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). We have jurisdiction over this timely filed appeal pursuant to 28 U.S.C. § 1291. We reverse as to appellant Carr because we conclude that the jury's verdict was not supported by substantial evidence, and because she is entitled on this record to immunity under both state and federal law. We reverse also as to the City of San Diego.

## II

## Facts

## A.

Because Poppell's motive-based constitutional claims that he was maliciously and selectively prosecuted depend entirely on in-

ferences, we begin our discussion of the facts of this case with a review of (1) what inferences are, (2) how they work in the realm of legal reasoning, (3) when an inference is valid, and (4) when it is not. As Justice Felix Frankfurter observed after twenty-three years on the bench, "Fragile as reason is and limited as law is as the expression of the institutionalized medium of reason, that's all we have standing between us and the tyranny of mere will and the cruelty of unbridled, unprincipled, undisciplined feeling."[1] Thus, we shall array in detail the facts and circumstances of Poppell's case which are necessary to our ultimate conclusion that his main claims fail against Carr for a lack of supporting evidence.

■ An inference is a process in which one proposition (a conclusion) is arrived at and affirmed on the basis of one or more other propositions, which were accepted as the starting point of the process. Stebbing observes that inference "may be defined as a mental process in which a thinker passes from the apprehension of something given, the datum, to something, the conclusion, related in a certain way to the datum, and accepted only because the datum has been accepted." It is a process where the thinker passes from one proposition to another that is connected with the former in some way. But for the passage to be valid, it must be made according to the laws of logic that permit a reasonable movement from one proposition to another. Inference, then is "any passing from knowledge to new knowledge." The passage cannot be mere speculation, intuition or guessing. The key to a logical inference is the reasonable probability that the conclusion flows from the evidentiary datum because of past experiences in human affairs. A nickel-plated revolver was used in the bank holdup by a ski-masked robber who got away with $10,000 in marked money. A nickel-plated revolver, a ski-mask and $10,000 in marked money is found in the apartment of Dirty Dan, its sole occupant. The inference is permissible that our friend Dan was the bank robber. A moment is necessary to discuss the differ-

ence between *inference* and *implication*. These terms are obverse sides of the same coin. We *infer* a conclusion from the data; the data *implies* the conclusion. Professor Cooley explains: "When a series of statements is an instance of a valid form of inference, the conclusion will be said to *follow* from the premises, and the premises to *imply* the conclusion. If a set of premises implies a conclusion, then whenever the premises are accepted as true, the conclusion must be accepted as true also...." As [Joseph Gerard] Brennan put it, "In ordinary discourse, [implication] may mean 'to give a hint,' and [inference], 'to take a hint.' Thus when my hostess yawns and looks at her watch, I *infer* from her behavior that she would like me to go home. Her yawn and look *imply* that this is her desire." Drawing a proper inference is critical in the practice of law:

> The line between a reasonable inference that may permissibly be drawn by a jury from basic facts in evidence and an impermissible speculation is not drawn by judicial idiosyncrasies. The line is drawn by the laws of logic. If there is an experience of logical probability that an ultimate fact will follow a stated narrative or historical fact, then the jury is given the opportunity to draw a conclusion because there is a reasonable probability that the conclusion flows from the proven facts. As the Supreme Court has stated [in *Galloway v. United States,* 319 U.S. 372, 395, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943)]: "The essential requirement is that mere speculation be not allowed to do duty for probative facts after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." [*Tose v. First Pa. Bank, N.A.,* 648 F.2d 879, 895 (3d Cir.1981).]

Ruggero J. Aldisert, *Logic for Lawyers: A Guide to Clear Legal Thinking* 26–27 (3d ed.1997).

### B.

Beginning in 1981, appellee Elbert Poppell operated a swingers' club called Thad's in

---

1. As quoted in Time, Sept. 7, 1962, at 15.

various locations throughout San Diego. The relevant law regarded his club as an adult entertainment establishment. Poppell's establishment provided a place for heterosexual consenting adults to disrobe, socialize, and dance in the nude, and engage in sexual acts. Poppell interviewed potential members and charged an initial membership fee as well as a nightly admission fee. The core group of members were, like Poppell, in their sixties and seventies. In later years, the social club attracted adults of all ages.

Poppell operated his establishment at many locations in San Diego throughout the ten years of its existence. Local law permitted him to operate such an adult entertainment establishment, but required that it be conducted only under specified circumstances, i.e., in the correct zone and at a certain distance from churches, schools, other adult entertainment establishments, and residential areas.

Poppell became embroiled over the years in numerous zoning disputes with the City regarding the various locations of his social club. In 1988, while Poppell was operating from a location on Monroe Street, Zoning Administrator and now appellant Sharren Carr brought charges to prosecutors that he was conducting his business in the wrong zone. Poppell was criminally prosecuted and convicted for conducting his business in a residential area. In the current proceeding, he admitted he was conducting his business on Monroe Street in violation of zoning regulations, i.e., within one thousand feet of a high school and in a residential neighborhood. He was placed on three years probation.

After his conviction, Poppell eventually relocated his establishment in early 1990 to Sunrise Street in a light industrial zone, designated I–1. On his application for a transfer of his former business tax certificate, however, Poppell fudged the nature of his club's business activities. Although Poppell planned to use the location for nude social events, on the certificate he stated that he would use the location for "screening and introduction of potential club members and office use." When asked at trial why he did not describe his business as a sexual encounter center, his answer was, "No special reason." He conceded, however, that his omission was deliberate because he disagreed with Carr and previous court rulings that his business was an adult entertainment establishment. Nevertheless, Carr personally reviewed the Sunrise location, assured Poppell that he was in compliance with applicable regulations, and approved the application. At trial, Carr described this approval as a mistake based on staff investigation that reported to her that the area was "clear," indicating it was not known to be in an improper location. Poppell acknowledged at trial that the only way he was able to operate on Sunrise Street was because of Carr's mistake.

Without incident, Poppell operated on Sunrise for one year. In the words of his lawyer, "[h]e didn't have any hassle from zoning people, building code people, or police officers." When the building owner planned to sell the building, however, Poppell was forced to relocate to his final location at 3488 E Street, still in the same light I–1 industrial zone, but in a much smaller building a block distant from Sunrise. The only other residence on the street was the family home of Archie Moore and his daughter, Rena. The 760 square foot residence on a dead end street into which he relocated was in disrepair. Without the necessary permits, Poppell significantly remodeled the house and erected a tall, locking chain link fence topped with barbed wire around the property.

Poppell opened the club at the E Street location on January 1, 1991. He was still on probation for his Monroe Street violation. On March 8, 1991, Poppell's written application to transfer his business tax certificate from Sunrise Street to E Street was routinely but mistakenly approved by the city zoning department based on his previous misdescription of his business as a social club and the department's earlier mistake as to the "clear" status of the Sunrise location. Carr did not participate in this process and did not know that Poppell had moved. No one from the Zoning Investigation Division inspected the location. The matter was apparently handled as a paperwork transaction by Allison Sherwood as a simple change of address

in the same zone. Poppell ran his social club at the new E Street location for seven months without incident.

## C.

In August 1991, however, Ms. Rena Moore, Poppell's new residential neighbor, made numerous complaints to the City through her City Council representative, Bob Filner, regarding Poppell's club. According to her testimony at trial, she also made between 50–150 calls to the police. She complained about the existence of the club and alleged that it caused increased traffic and trash, including used condoms and syringes left around the area. She reported that Poppell's club members were openly engaging in oral sex in cars in front of her house and that employees were drinking during the day. In addition, Moore complained that Poppell had made improper modifications and additions to the residence. She also inquired about whether the club was in compliance with the zoning laws.

This barrage of complaints by a citizen prompted her councilman to respond by having his office contact various City departments, resulting in an investigation into the manner in which Poppell was conducting his business. The police investigated and determined that it was an adult entertainment establishment and had been misdescribed on his business tax license. On October 16, 1991, Filner wrote Moore a letter in which he assured her that based on "preliminary reports," various departments of the City of San Diego were working together to develop a plan to close down Poppell's club.[2]

On August 9, 1991, Poppell received notification from the fire marshal indicating that a large fuel tank located on his property was in violation of the fire code. The following week, four San Diego police officers visited Poppell's club to investigate Moore's complaints. They found no evidence of condoms or syringes. For the next several weekends, the police positioned their squad cars in the middle of the street in front of Poppell's property, sometimes with their headlights or spotlights on. Several of the police officers shined their flashlights into club members' cars, wrote citations for parking violations, and allegedly intimidated and harassed Poppell and his club members.

At this time, several city officials, including Carr, discussed Poppell and his nudist club at one of their regular meetings. On August 29, 1991, Carr met with the head of the City Attorney's Code Enforcement Unit for the City Attorney's Office. In a follow-up review based on Moore's complaint, Carr had concluded that Poppell was then in violation of the zoning laws. Thus, Carr submitted Poppell's case to City Attorney Joseph Schilling and the Code Enforcement Unit for investigation of the alleged zoning and building code violations.

Carr discussed Poppell's case during routine weekly meetings with Schilling. Evidence presented at trial indicated that Carr may not have initially mentioned to the City Attorney's Office that zoning officials had mistakenly granted Poppell a permit to operate his social club at the E Street location. However, the record contains documentary evidence noticing the mistake in the form of a sworn declaration prepared by Linda D. Hanley under penalty of perjury dated January 9, 1992 and submitted to Schilling. Hanley was a Senior Zoning Administrator who worked for Carr. In this declaration, the City Attorney was apprised that although the social club was operating in an improper zone, a "City of San Diego Declaration of Business Tax Certificate was signed off in error by Zoning Services in March 1991." Hanley's declaration was (1) prepared in connection with her personal inspection of the E Street location, (2) attached to and incorporated into the Return on the Inspection Warrant se-

---

2. Also in August 1991, after oral assurances that he would no longer be bothered by the officials at his E Street location so long as he did not break the law and with confirmation that he was operating in the correct zone, Poppell voluntarily dismissed his pending lawsuit against the City of San Diego, Zoning Administrator Carr, and other city officials. The lawsuit had originated from

the late 1980s, from Poppell's zoning violations while at the Monroe Street location. From the record, it appears clearly that the timing of this dismissal was coincidental. Carr testified that the E Street investigation began as a result of a citizen's complaint. All the evidence in the record conclusively supports this testimony.

cured from the Municipal Court to inspect the premises, and then (3) submitted to prosecutors while they were considering charges against Poppell. We note that the Return itself was prepared by Michael Hart, the City Attorney's litigation investigator, based on information he received from those conducting the inspection.

The Zoning Investigation Division of the Neighborhood Code Compliance Department ordinarily had discretion to notify offenders to ensure enforcement, either by written warning or administrative fines. However, the City Attorney's office had directed City zoning officials to prepare and submit cases of repeat violators to the City Attorney's Office without exercising administrative options available to them. Carr so testified, and Poppell introduced no evidence to dispute this fact. Deputy City Attorney Diane Silva–Martinez, the Head Deputy of the Citizen's Code Enforcement Unit confirmed Carr's testimony when she explained this process:

Q. Do the departments have the ability to handle building, zoning, fire, or other violations on their own?

A. (By Silva–Martinez) Yes, they do.

Q. Under what circumstances do they— and referring to that timeframe, under what circumstances could they handle cases on their own?

A. Well, the majority of the cases that the departments handle they achieve—are able to obtain voluntary compliance. So that ten to 15 percent that they don't, they receive—they refer the case to us. They achieve voluntary compliance through meetings, notice of violations, referring the case to mediation, or using some other tool to gain compliance.

Q. Do you know whether or not the Zoning Administrator of the Neighborhood Code Compliance Department did not exercise an administrative remedy in Mr. Poppell's case?

A. She did not.

Q. Okay. Do you know why?

A. Because the property owner had already faced a criminal action in the past. And the Code Enforcement Unit's Directive to the City Departments, if there has already been a criminal action against that person, is to immediately refer the case to the City Attorney's office.

Q. And whose policy is that?

A. It's the prosecutor's policy of the Code Enforcement Unit's Policy.

Q. That's your policy right now?

A. Correct.

Q. And Mr. Schilling's back then?

A. That's correct.

Q. And what's the reason for that?

A. Because it would be a waste of time to do anything else, basically. The—in most times, the person is still on probation for a same or similar violation. To have had to file an action in the past means that we've already tried everything else.

Q. Is that policy in effect in all cases?

A. Yes it is.

Q. Once a case is turned over to the Code Enforcement Unit, whose case is it in terms of decision making?

A. It's the prosecutor's case to decide how to proceed with the case.

Poppell was a repeat offender, known personally to Carr from his Monroe Street convictions for which he had been placed on probation.

### D.

When the City Attorney's Code Enforcement Unit assumed responsibility for this matter in August, 1991, it conducted its own investigation. An important step in this process was to investigate the premises. This duty was eventually assigned by Silva–Martinez and Schilling to Michael Hart, a litigation investigator assigned to the Code Enforcement Unit. Starting in November, 1991, Hart placed many telephone calls to the club seeking cooperation, but his attempts went unanswered. He sent a letter to Poppell, but the letter, too, produced no response. Faced with this conduct, Hart then prepared the legal documents required to secure an inspection warrant from the Municipal Court,

which was issued by Judge Dominitz on December 17, 1991. This warrant's affiant was Randall Ward, a City Building Inspector. To serve it, the warrant required Hart to post the property with a "notice of intent to conduct an inspection," and to make an additional phone call to the property, both of which Hart did. The warrant was served a few days later. In the warrant, the Court made a finding that reasonable attempts to arrange an inspection with the property owner had either been unsuccessful or ignored.

The inspection ordered by the warrant was conducted by Ward, Linda Hanley, and Gary Allen, a fire inspector. Hanley may have received this inspection assignment from Carr. Both Ward and Hanley observed zoning and code violations during the inspection, evidence of which was identified in the Return to the Inspection Warrant provided by Hart and conveyed to the prosecutors.

Poppell was then formally charged by the City Attorney with four criminal zoning violations: two counts of operating an adult entertainment establishment within one thousand feet of a residential zone, known as the one thousand foot rule, and two counts of operating an adult entertainment establishment in an improper zone. He was notified of these charges by mail.

Silva–Martinez explained the City's Attorney's decision to charge Poppell with misdemeanor offenses:

Q. After the inspection, do you recall becoming personally aware of the results of the inspections?

A. (By Silva–Martinez) Yes.

Q. And after the inspection, what conclusions were reached by the three prosecuting—let me ask you this. Did the decision making among the three prosecutors—yourself, Schilling, and Ms. Scanlan—did that—were you independently or were you working together?

A. We were working together.

Q. Okay. And after the inspection, what conclusions were reached by the three of you working together?

A. That there were serious code violations at the property, which included building, fire, and zoning violations; that there was probable cause or sufficient bases by which a criminal complaint should go forward.

Q. Now, you've discussed what the options were in this particular case. Do you recall the reasons why—well, what did the prosecutors decide to do in Mr. Poppell's case?

A. File a criminal complaint.

Q. Why did you decide to do that rather than one of the other options you had?

A. Because our policy is, and for good reason, that this individual had been in criminal court before. There was another criminal action. And it would have been a waste of time to go civilly, to sit down with the person who had been so uncooperative that we needed an inspection warrant to get on the premises and hadn't shown any indication of voluntary compliance. So it was very easy to decide we needed to file an action in court. The decision to go criminally, rather than civilly, is one of strategy as well as efficiency.

Q. Ms. Silva–Martinez, why did you all decide not to go civilly?

A. Because what my understanding of previous actions and the defendant's was that he was inclined to basically file a lot of papers in court. And if we wanted to file civilly, there would have been no assurances that we would have been able to obtain an order to immediately shut his business and that we might have been caught up in many, many motions basically papering each other to death, which could have taken a very long time to get compliance.

Whereas, in a criminal action, we would have been in court in three weeks and probably would have quicker assurances of gaining compliance in a more timely fashion.

Q. Now, Ms. Silva–Martinez, you mentioned two things, first of all, shutting down his business and, secondly, obtaining compliance. Is there a difference between the two?

A. Yes. Because the activity could stop, but there still would be outstanding code violations that would have had to be corrected separate from the activity, for example, electrical violations, the removal of the fuel tank, things of that nature.

Q. Referring to the items that were at issue when this case was filed, were there violations which the three prosecutors considered serious enough to be safety issues for the respective people that went to the premises?

A. Yes.

The complaint was later amended to include 90 counts of building code violations, of which only 26 remained at the time of trial. Poppell was acquitted of the two counts relating to the one thousand foot rule. He was convicted of operating an adult entertainment establishment in an improper zone. He was also found guilty of twenty-four of the building code violations.

### E.

Because what transpired in San Diego Municipal Court in connection with these charges is critical to an understanding of our holding in connection with whether Poppell's prosecution was actionably malicious, we discuss it here in detail, and we borrow almost verbatim from then Magistrate Judge Moskowitz's excellent "Report and Recommendation for the Issuance of a Writ of Habeas Corpus" filed on April 7, 1995 in the United States District Court for the Southern District of California.

During a motions hearing, Poppell's counsel argued that the City of San Diego should be estopped from prosecuting Poppell for the zoning violations based on the issuance of the Zoning Use Certificate Approvals and assurances by the City Attorney's Office that he would now not be bothered if he obeyed the law. The prosecution argued in response that the zoning approval necessary for the business tax certificate was based on approval for a social club, not an adult entertainment establishment. Defense counsel countered that the Zoning Department was aware of what kind of activity was conducted at Poppell's club, and that it was clear to all

concerned that the City Planning Department knew that Poppell was engaged in adult entertainment but nonetheless certified that he could operate in the I–1 zone. The prosecution argued, however, that zoning violations were strict liability offenses and, therefore, that estoppel based on governmental mistake was not a defense. In response to defense counsel's argument that the City had "known all along what [Poppell's] establishment is and what it does," the trial judge stated,

Any they [sic] approved that. The question is now, is it strict liability? If it's strict liability, even [if] some government official made a mistake or approved it or whatever, I'm not so sure it's a defense. In fact, I don't think it is and then you may not be able to bring it up....

The following day, the court ruled that zoning violations were strict liability offenses. Section 101.0212 of the 1994 version of the San Diego Municipal Code states that "[v]iolations of this Chapter shall be treated as strict liability offenses regardless of intent." San Diego, Cal., Mun.Code § 101.0212 (1994).

The prosecution then argued against allowing Poppell to raise a defense based on the mistaken issuance of zoning use approval, relying on *Pettitt v. City of Fresno*, 34 Cal. App.3d 813, 819, 110 Cal.Rptr. 262, 265 (1973). The prosecution contended that, "as a matter of law the City cannot be estopped to deny the validity of a permit or other representation respecting the use of property issued or made in violation of the express provisions of a zoning ordinance." After discussing the issue over a two-day period, the trial judge agreed with the prosecution. He ruled that any defense evidence concerning the government's conduct or the issue of estoppel was irrelevant and would be excluded.

After suffering these setbacks, Poppell agreed to waive trial by jury and to submit the matter to the trial court on the basis of stipulated facts. The trial judge advised Poppell that if his decision were reversed, he could then have a right to a jury trial. On August 31, 1991, the court found Poppell not guilty of Counts One and Three which alleged the operation of an adult entertainment

establishment within one thousand feet of a residential zone. Apparently, as we glean from the record [R.T. 1102–1104] and from footnote 5 of Judge Moskowitz's Report, the City had miscalculated the distance due to the existence of a freeway in the vicinity. However, the court found Poppell guilty on Counts Two and Four of operating on February 9, and November 23, 1991 an adult entertainment establishment in an area not zoned for such use. Poppell was also convicted of twenty-four building, plumbing, electrical, and mechanical code violations. We note that Poppell's convictions of these building code violations have not been drawn into question and remain in full force and effect.

Prior to sentencing, Poppell filed a motion for a new trial. The purpose of the motion was to advance again and for the record his argument on the applicability of either the defense of mistake of fact or estoppel. The trial court denied the motion, remarking that Poppell had adequately presented the argument for the record.

Violations of the San Diego Municipal Code are misdemeanors subject to a fine of not more than one thousand dollars or imprisonment in the county jail for a period of not more than six months or both. *See* San Diego, Cal., Mun.Code § 12.0201 (1994). On each count, Poppell was sentenced to three years of summary probation on the condition that he serve ninety days in custody. The custody sentences on all but Counts Two and Four were stayed. The sentences on Counts Two and Four were ordered to run consecutively for a total of 180 days.

#### · F.

Poppell appealed the zoning convictions. He argued that the trial court had improperly refused to admit evidence that the zoning administrator had given, albeit mistakenly, her approval regarding the club's location. Throughout the California state court system, the zoning convictions were affirmed, on direct appeal by the Appellate Division of the Superior Court, and then on denial of a writ of habeas corpus by the Superior Court, which in turn was affirmed by the California Court of Appeal and the California Supreme Court. Every California court examining

Poppell's assertion that he should have been permitted to use the mistaken approval of his zoning application to defend against the zoning charges ruled against him. In so doing, the courts sustained the City Attorney's contention that because San Diego's zoning laws imposed strict liability, a mistaken approval was legally irrelevant.

#### G.

After exhausting his state remedies, Poppell filed a writ of habeas corpus in federal court. Judge Rhoades granted the writ on the ground recommended by Judge Moskowitz that Poppell's due process rights were violated by the trial court's refusal to admit evidence of the city zoning administrator's mistaken approval. Judge Rhoades reasoned that reliance on a public officer's advice may, as a matter of federal constitutional law, raise an entrapment by estoppel defense, even in strict liability cases. *See United States v. Brebner*, 951 F.2d 1017, 1025 (9th Cir.1991) (noting that entrapment by estoppel is based on principles of fairness and not on defendant's state of mind). Because the trial court excluded evidence of the mistaken permit, thereby denying Poppell his only possible viable defense, federal habeas relief was appropriate. Further, Judge Rhoades held that although the City erroneously issued zoning approval for Poppell's club, the City could not be estopped from enforcing its zoning ordinances. Thus, Poppell's zoning convictions were vacated on federal habeas grounds.

Judge Rhoades did *not* rule that Poppell could not be retried-to the contrary. The district court granted 45 days to Deputy City Attorney Edmundson to decide whether to re-try the case on the original zoning charges of which Poppell had been convicted, with Poppell being permitted to raise his defense, or the City could drop it. With Silva–Martinez's participation, the City decided not to retry Poppell, but only because he had already been convicted of 24 building code violations and had promised to the federal court during a bail hearing that he was no longer going to operate his business. We highlight these facts because they reflect on the issue of whether malice was present in

the process by which he was taken to trial for the E Street zoning violations discovered by Carr and Hanley.

## III

### Poppell's Current Lawsuit

Poppell then filed this action against Zoning Administrator Sharren Carr, the City of San Diego, and several police officers seeking "vindication of his constitutional rights to freedom of speech and assembly, due process of law, and to equal protection under the law." Carr was named as a defendant on the second claim (federal claims), fifth claim (state constitution directly), sixth claim (state constitution under Cal. Civ.Code § 52.1), and seventh claim (infliction of emotional distress). The City was named as a defendant on the fourth claim (*Monell*), and the fifth, sixth, and seventh claims as above. Two police officers, Larson and Albright, were named as defendants in the third claim, but they are not parties to this appeal. Not surprisingly, the case was assigned to Judge Rhoades.

Poppell structured the main thrust of his case around two different but closely related theories. One of his theories was based on our holding in *Usher v. City of Los Angeles,* 828 F.2d 556, 562 (9th Cir.1987). *Usher* holds that a malicious prosecution with the intent to deprive a person of equal protection of the law or otherwise to subject a person to a denial of constitutional rights is cognizable under § 1983. Poppell claimed that when Carr referred the matter of his apparent zoning violations to the City Attorney, she acted with malicious intent to deprive him of his constitutional rights to (1) freedom of assembly, (2) freedom of association, (3) freedom of speech, and (4) the right to pursue an occupation.

■ As a general proposition, *Usher* articulates a constitutional right against such a perverse prosecution that is clearly established. *See Cline v. Brusett,* 661 F.2d 108, 112 (9th Cir.1981); *Bretz v. Kelman,* 773 F.2d 1026, 1031 (9th Cir.1985) (en banc). Because this particular and well-defined right has been clearly established since at least 1981, Carr cannot defeat it with a claim

of qualified immunity. No reasonable official could claim that he could not know that it violates the established law maliciously and selectively to use without probable cause a criminal prosecution for the purpose of infringing upon a person's constitutional rights.

■ Poppell also alleged as a second theory-apart from his claim of malicious prosecution-that Carr violated his right to equal protection of the laws by singling him out for prosecution on account of his exercise of the same rights he invoked in his malicious prosecution theory. According to Poppell, the true purpose of his prosecution was to drive him out of business.

Carr moved for judgment as a matter of law based on a claim of qualified immunity. She argued on the facts that in her capacity as the Zoning Administrator for the City and pursuant to City policy, she had simply referred Poppell's apparent zoning and building code violations to the City Attorney's Office for its independent review. She disclaimed any equal protection or due process violations. The district court considered and rejected her claim of qualified immunity. Judge Rhoades correctly reasoned on the basis of our holding in *Usher* that if Poppell were able to prove malicious intent and unconstitutional purpose with respect to the counts on which he had been found not guilty, defendants would not be acting reasonably or in good faith. Accordingly, as there was a genuine issue regarding Carr's motive and purpose, the judge declined to rule on the issue and instead instructed the jury on qualified immunity as a possible defense.

The jury concluded from the evidence presented at trial that defendants engaged in a systematic and concerted effort to drive Poppell out of business. Specifically, the jury found Carr had acted with malicious intent, and that she was not entitled to the defense of qualified immunity.

## IV

### Malicious Prosecution

■ Poppell alleged at trial that Carr was instrumental in the initiation and perpetua-

tion of the City's prosecution of him. Poppell contended that Carr acted with malice and with a purpose to deprive him of specified constitutional rights. The "purpose" element of this claim presupposes a knowledge of or a deliberate indifference to the rights at issue.

■ A jury verdict must be affirmed if substantial evidence supports the verdict. *See Landes Constr. Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1369–71 (9th Cir. 1987). "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Maynard v. City of San Jose,* 37 F.3d 1396, 1404 (9th Cir. 1994). The jury found Carr had acted with malice and had intentionally attempted to deprive Poppell of his constitutional rights. Although we have taken great care to respect the prerogatives of the jury, we reverse its decision and hold that there is no substantial evidence in the record from which it reasonably could have so concluded. On close examination, Poppell's case against Carr is a case of theories and suppositions without evidentiary support. Speculation was allowed to do duty for probative facts as there was no evidence of malice: Carr merely did what was required of her by virtue of her job.

## V

### Malice and Intent

■ The judge instructed the jury that the meaning of malice was "a wish to vex, annoy or injury another person ... the doing of an act for some improper or wrongful motive or purpose." The record is devoid of any substantial inculpatory evidence demonstrating malice or an unconstitutional purpose or intent. Performing her required duties as a city zoning administrator and acting not on her own motion but on a citizen's complaint, Carr followed department protocol. It was the *prosecutor*'s independent decision, based on the evidence of a violation, to prosecute. Furthermore, the official policy of the City Attorney indisputably required Carr at that time to turn over all cases involving repeat offenders to the City

Attorney immediately without any efforts to pursue administrative remedies. Poppell was such a repeat offender. He was operating his adult entertainment business in a prohibited zone. Pursuant to Carr's official duty, she turned over the information regarding Poppell's violations. She had no discretion to do otherwise. Contrary to Poppell's lawyer's claims, *no* law-constitutional or otherwise-required this set of facts and circumstances to be handled administratively, and *no* law protected Poppell from becoming a defendant on these charges. Then, the City Attorney's Office was faced with the decision whether to prosecute Poppell criminally. Armed with all the information, including the memorandum indicating Poppell had mistakenly received a permit for operation at the E Street location, the prosecutor made the decision to file criminal charges against Poppell. In fact, Hanley's declaration outlined an alternative approach, which was to seek voluntary compliance. The City Attorney rejected this approach and decided to prosecute. This prosecutorial decision is granted absolute immunity as it squarely fell within the immunity granted a prosecutor's discretionary charging decisions. *See United States v. Doe,* 125 F.3d 1249, 1254 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1100, 140 L.Ed.2d 154 (1998). "[T]he exercise of prosecutorial judgment will usually insulate investigating officers from liability." *See Smiddy v. Varney,* 803 F.2d 1469, 1471 (9th Cir.1986), *modified on other grounds,* 811 F.2d 504 (9th Cir.1987).

There was no evidence in the record to suggest that Carr actively participated in the prosecutors' decision to charge Poppell. The City Attorney's Office employed its own investigator to look into the case, and the existence of violations of the law was verified via the service of a lawfully executed warrant. City Attorney Silva–Martinez testified that three prosecutors exercised their own independent judgment and chose to charge Poppell criminally for his repeated zoning violations. The uncontradicted evidence as to the source of the disputed one thousand foot rule charging decision was that it was made "probably from [zoning] maps":

Q. (By Poppell's attorney) Ms. Silva–Martinez, do you know where the City

Attorney's Office got its information with which to charge Mr. Poppell with being in violation of the thousand foot Rule, counts 1 and 3?

A. (By Silva–Martinez) Probably from maps.

.    .    .    .    .

Q. So whatever you knew, you knew from whatever Mr. Schilling and Ms. Scanlan told you; isn't it correct?

A. And the evidence I saw before me.

Q. What evidence did you look at relating to zoning?

A. My recollection was at meetings there were zoning maps, and we're all very familiar with the municipal code.

Q. But when you were in those meetings looking at maps, was Ms. Carr present?

A. No.

Q. Was anybody else from Zoning present.

A. No.

[R.T. 1105–07]

■ Under California law, a prosecution can be malicious with respect to some counts in a complaint even though other counts resulted in a conviction. *See Singleton v. Perry,* 45 Cal.2d 489, 497–98, 289 P.2d 794 (1955). An acquittal, however, reveals very little-if anything-about whether the charges were procured with malice. Any number of innocent factors can contribute to an acquittal, including the high burden of proof. In this case, the record contains no direct evidence of malice, and no substantial evidence that the acquittals were the result of anything other than a mistaken calculation of distance having to do with the existence of a freeway between the two relevant points of measurement. It seems highly unlikely that an objectively verifiable element such as the measurement of 1000 feet would be purposefully misrepresented. The fact of an acquittal simply does not establish in this context either a lack of probable cause for the charges or the existence of malice, especially where the counts of conviction-unlike *Singleton*-related directly to the very same establishment. This is certainly so where a rea-

sonable zoning official could have believed that her actions were within the law. This is not a case where joined counts related to different situations or sets of operative facts: the four zoning counts stemmed from the same business at the same location and were simply a different iteration of the same offense.

The linchpin of Poppell's attempt to show actionable malice and intent is the allegation that Carr did not notify the City Attorney of the mistaken approval of the E Street location. The first problem with this allegation as "smoking gun" evidence that implies malice is that under California's substantive zoning law, the mistake was irrelevant and did not confer upon Poppell either the ability to remain on E Street or protection from criminal prosecution. Poppell's right to a defense of estoppel was not recognized by any California State judge in front of whom it was argued. The City quoted from *Pettitt v. City of Fresno,* 34 Cal.App.3d 813, 820, 110 Cal. Rptr. 262, 266 (1973): "[T]he public and community interest in preserving the community patterns of zoning laws outweighs the injustice that may be incurred by the individual in relying on an invalid permit to build issued in violation of zoning laws." The entirety of the California judicial officials could not recognize Poppell's alleged defense from which his claims arise. We believe that such a performance by the judiciary sheds light on whether his prosecution by the City was carried out with malice and without probable cause.

The district judge recognized this precise problem on day five of the trial when he discussed in this case his earlier difficulties with the estoppel claim in the habeas corpus case. To understand Judge Rhoades's observations, one must keep in mind that he is the same judge who reviewed and then followed Judge Moskowitz's favorable Report and Recommendation regarding Poppell's application for a writ of habeas corpus.

The Court (Judge Rhoades): As I understand it, the trial judge held that the evidence, which I assume came out or attempted to come out at the time of trial, couldn't be received, right? That was the estoppel evidence?

Mr. Marrinan (Counsel for Poppell): Right.

The Court: And so the trial judge—it finally got over to me and I did an awful lot of research on it and finally decided there was an estoppel. But I've been around a long time and investigated a lot of cases and have done a lot of legal study. I finally came to the conclusion that the trial judge was wrong. But here you have a prosecutor who argued that estoppel evidence was not good, could not, as a matter of law, go in, a trial judge who agreed. And that went up through the appellate courts, right?

Mr. Marrinan: Yes.

The Court: Supreme Court of California who agrees.

Mr. Marrinan: Well, I don't think it's fair to say they agree, your Honor.

The Court: But didn't they reverse.

Mr. Marrinan: Right. Their only question was: should we grant a hearing?

The Court: They didn't grant a hearing, but the Appellate Department in the Superior Court agreed, right?

Mr. Marrinan: Well, let me think about that for one moment. Well, all we know from them is one sentence that says "Judgment Affirmed."

The Court: . . . How is Ms. Hanley or Mr. Hart, if the Supreme Court of California doesn't know, how are they going to know that that is something that they should have brought to the attention of the prosecutor when everybody up the—got over to me in the federal court, who had a lot of time to look at it, had a lot of law clerks looking at it, I finally decided it was something that would go in. Okay? So how do those city officials—how can you say that they were to know and they should have even revealed it?

Mr. Marrinan: Well, here's I think, the situation. First of all, for example, Mr. Hart, I'm willing to submit it as to Mr. Hart.

Unlike any of the courts, including this court, really, in that habeas corpus petition. These people—I was going to say they knew all the facts . . . .

The Court: Well, I'll assume that. But let's assume that they knew. Is there an obligation for an investigator to tell the prosecutor information that a court of the Supreme Court of California held that they were relevant.

Mr. Marrinan: Well, under these circumstances, I think so, your honor.

The Court reiterated these same concerns on day six:

The Court: As to malice, no matter with the lessor definition of malice and malicious prosecution, there's nothing to suggest that Ms. Carr, and the plaintiff makes the argument that since she had been sued once, then they might suggest that she might have acted in a malicious manner.

But Ms. Hanley and Mr. Rogers, Ms. Hanley just went out that day because she was around. It was Christmas time and everyone else was gone. She went along and wrote a report. Mr. Rogers is kind of the same way. And I just don't see malice.

And then that argument that I made yesterday—and I should have been probably keeping my mouth shut—but the argument that went to the Supreme Court of California and the Supreme Court of California thinks there's probable cause, how would these people, who are just investigators, not think that there was probable cause?

And it had to go to a federal court who spent a lot of time. And I was the one that did it. It took a lot of time and effort to determine that estoppel—that the evidence as to—that somebody in the Zoning Department had told him that he was not in violation of zoning laws. That should have been presented. A Municipal Court Judge felt it shouldn't be presented, and he knew it at that time because there was an effort to present it. The Appellate Department of the Superior Court said it wasn't necessary to present it. The Supreme Court of California by the—maybe it was a postcard or one line, but they certainly didn't overturn it. They felt it shouldn't be presented.

I don't know how these two people, Hanley and Rogers, would have any idea. That probably applies to Ms. Carr, too, but I'm going think about Ms. Carr some more.

An experienced and knowledgeable district court judge had much trouble with Poppell's theories and with the import of his evidence. We believe his determined struggle tells us much about the validity of Poppell's case. Zoning Administrator Carr objectively could have and reasonably did believe her treatment of Poppell was lawful. To reiterate, the record is devoid of any substantial evidence that she knew she was depriving Poppell of *any* constitutional right or that this was her purpose. As the record reveals, Carr merely responded to a citizen's complaint and, after an initial review, referred the matter as she had been officially directed to the appropriate prosecutor. Given the City Attorney's referral policy, Carr did not have discretion under the system of which she was a part to do otherwise. The prosecutor's office, which conducted its own investigation of the allegations, *was* advised in Hanley's sworn declaration *prior* to the decision to file criminal charges that a permit had mistakenly been issued to Poppell. Even if Carr initially did fail to communicate to the prosecutor information regarding the mistaken permit, this information according to the City's lawyers was substantively irrelevant. Under California law, violations of zoning and building ordinances were strict liability offenses. *See People v. Bachrach,* 170 Cal.Rptr. 773, 114 Cal.App.3d Supp. 8, 12 (1980); *People v. Travers,* 52 Cal.App.3d 111, 114, 124 Cal.Rptr. 728 (1975). California law on this difficult issue is surely germane to our comprehension of this case.

This case is not about the suppression of exculpatory evidence, to the contrary. Poppell and his counsel were fully aware of the facts and circumstances supporting his defense of estoppel, and they asserted them in Municipal Court in blazing fashion as soon as they had the opportunity. Carr did not deprive him of his defense; the state courts did-based on the good faith but mistaken arguments advanced by the City Attorney.

Silva–Martinez was quite clear about the City Attorney's view of the mistaken approval issue and whether it would have changed the City Attorney's decision to prosecute: it would not.

Q. As head of the unit now, would it be important for you to know that a person who you were considering prosecuting for a zoning violation had been approved by zoning to operate in that location?

A. (By Silva–Martinez) Yes.

Q. That would be very important, wouldn't it?

A. It would be important.

Q. Because it might not be just to prosecute somebody for a zoning violation if they had been told by the head zoning officials that they were proper in that zone; isn't that true?

A. It would be something that I would look at, but I also know that it would never override the decision to go forward on a case, because the most important thing is to get the violation corrected. If someone made a mistake in the case, let's say it was zoning, there are specific code sections and there is much case law that says that that does not estop us from going forward with an action. So that doesn't make everything stop at all. We would look at it.

Q. And it would be a factor in your decision, whether you were doing justice by prosecuting the person; isn't that true?

A. Yes.

　　.　　　.　　　.　　　.　　　.

Q. Well, do you know when [Poppell] got off probation?

A. I don't know, but if he wasn't, that wouldn't have been uncommon either. We still would have proceeded criminally and filed a criminal action.

Q. No matter when the prior action was?

A. Yes.

Q. No matter what it was for?

A. Probably.

**966**

Q. So if there had been a zoning violation—

A. This is a person we had to get an inspection warrant against. You're making it sound like that was all we looked at. This was an extremely uncooperative person that had serious violations on his property, that we were hearing nothing but bad things about as far as from the activity that was impacting the community, as far as the serious violations that would be impacting anybody that would be inside the building.

. . . . .

A. . . . I've handled a lot of cases like this, and the issue that you're going for is one of estoppel. *And the case law is that the city is not estopped from proceeding in a case if a city department or person has issued any permanent error or given any information that would make the person allegedly detrimental to rely on those facts.*

(emphasis added). We know with certainty from this unrebutted record that the City Attorney's considered legal position as stated successfully at every level of California's court system was that the mistaken approval was irrelevant. Thus, we can safely conclude that the City Attorney's absolutely immune decision to prosecute Poppell as a repeat offender was unaffected by the information on which estoppel might be based. The legal arm of the City surely did not recognize Poppell's defense, and in this context, Carr cannot reasonably be held to a different standard. Any omission attributed to her was utterly harmless and cannot be regarded as a basis from which malice can be properly inferred.

There is no objective reason the nonlawyer zoning administrator should know that the City Attorney's litigation position regarding the existence of a possible *defense* to the charges was defective based on federal law. And, as we remarked in *Smiddy,* "It would be ironic if the presumably independent decisions of these immune officers would automatically result in enhanced liability for the

nonimmune police officers." 803 F.2d at 1472.

Moreover, and as we have noticed, the mistake on which Poppell relies *was* substantially communicated to the prosecution in the Hanley declaration. Poppell's attorney conclusively established this fact during his direct examination of Hanley as a plaintiff's witness:

Q. (By Poppell's attorney) So on that basis you believed [after the inspection] that he had been granted zoning approval in error, correct?

A. (By Hanley) Correct.

Q. And you did include a notation to that effect in a memo to Mr. Schilling?

A. That's correct.

Q. Did you notify Mr. Poppell that he had been granted zoning approval in error?

A. No, I did not.

Q. Why didn't you notify Mr. Poppell that he had been granted zoning approval in error?

A. I believed that I was directed to take my findings of my inspection and my report and send it directly to Mr. Schilling's office. So once the case is in the attorney's office, if there is any contact, it's normally through the attorney and the alleged attorney that correspondence is then handled. . . . [R.T. 602, 603]

Q. Now, in your memo to Mr. Schilling [of January 9, 1992], you indicated that *the zoning approval had been granted by mistake?*

A. Correct.

(emphasis added).

We note that Poppell's attorney never explicitly asked Carr whether she advised Schilling or his colleagues about the mistakes that had been made. Poppell did not call Schilling as a witness. In fact, the closest Poppell's attorney chose to come to this issue with Carr was to ask her questions that on their face do not seek information that is relevant or material to the question of withholding information:

Q. (By Poppell's attorney) Whether it was before or after, you did become aware in this case that Mr. Poppell was charged with a criminal violation of violating the thousand foot rule, correct?

A. (By Carr) Yes.

Q. And you also were aware that he was charged with a criminal violation of operating an adult entertainment establishment in an improper zone, correct?

A. Yes.

Q. And at any point did you say to Mr. Schilling or anybody in his office that it would be improper or unfair to charge Mr. Poppell with those crimes?

A. Did I state to the City Attorney's office it would be improper or unfair? No.

Q. And you knew that each of those charges carried potential six months in jail, correct?

A. Any violation of the Municipal Code carries six months in jail and a thousand dollar fine.

Q. Including these, correct?

A. Yes.

Q. And you knew sometime late in 1992, several months after the criminal charges were brought, you were aware that Mr. Poppell had been sentenced to six months in jail on the two zoning violations, correct?

A. Correct.

Q. At that time did you indicate to anybody from the City Attorney's office or the court system that that would be improper or unfair?

A. That I would go to the court?

Q. Or to the City Attorney.

A. Or the City Attorney? No.

We fail to see how an inquiry into whether Carr told anyone that she believed Poppell's prosecution to be "unfair" or "improper" advances Poppell's cause.

The groundlessness of Poppell's theory of malice and intent is made evident by his own testimony regarding Carr's official behavior and state of mind. He admitted that Carr approved his business at Sunrise Street and that he was able to operate there without any problems with City officials, but ascribed a devious purpose to her without support in the record. In fact, it is contradicted at every turn:

Q. (By the City Attorney) In fact, on Sunrise Street, isn't it true, Mr. Poppell, that [Carr] was the one that approved you for Sunrise Street and that's essentially—during the time that we've been talking about, that's the only place you were able to operate without any sort of problems?

A. (By Poppell) She entrapped me there on Sunrise Street.

Q. She entrapped you?

A. If she gave me the permission to be there and then her intent was to prosecute me, that's entrapment.

Q. Did she ever prosecute you on Sunrise Street?

A. No, but on E Street, she did.

Q. Mr. Poppell, did she ever prosecute you on Sunrise Street?

A. No, she didn't.

Q. Did anyone ever complain about Sunrise Street to your knowledge?

A. No.

Q. Do you know whether or not Ms. Carr went out there?

A. She said she did.

Q. Well, other than that, did she ever come out and tell you that she wanted you out of business?

A. No.

Q. You were in business on Sunrise Street because Ms. Carr approved you, even though you were within a thousand feet of a residential zone; is that not correct?

A. Yes.

Q. So her making a mistake was the only way you were able to operate on Sunrise Street?

A. That's true.

Q. And at the time you were on probation and couldn't operate anywhere in violation of the zoning codes?

A. That's true.

Q. Did Ms. Carr advise you to move over to E Street?

A. No, she did not.

Q. Did she have any role in your decision to move to E Street?

A. No.

Q. Did you personally talk with Ms. Carr about going to E Street?

A. No.

Q. Do you know whether or not she had any role at all personally in doing the approval for E Street?

A. No.

Q. Do you know who did approve you for E Street?

A. I believe it was A. Sherwood.

Q. Allison Sherwood?

A. I believe so.

R.T. 457–58.

Poppell did float another theory of conspiracy and malice that also finds no support in the record. At one point, Poppell had been taken on a probation violation before Municipal Judge Raymond Edwards, who declined to find him in violation. Poppell's attorney theorized from this event that "these people . . . figured, okay, we can characterize [Poppell] as a repeat offender. . . . We can get a different Judge than Ray Edwards who is the one-Judge Edwards who found him not to be in violation of probation, so they have to wait to prosecute him until after that so they get to go to another judge."

The problem with this as a conspiracy theory is that it is not grounded in any evidence, either direct or circumstantial. It is a rootless claim that demonstrates why cases must be tried on evidence and valid inferences, not rank conjecture and speculation. Search the record as we have, we find no support for Poppell's sinister judge-shopping theory.

But another consequence flows from the district court's approval of a criminal retrial, and especially from its statements to the effect that although Poppell might have a defense to the criminal charges, the mistake would not have permitted him to continue to operate in the prohibited zone. The conse-

quence is that the Filner letter upon which Poppell relies, and which Carr was not aware of until the trial, is rendered not only not inculpatory, but fully consistent with the law. Filner's October 16, 1991 letter to Ms. Moore advised her that a plan was being developed "to close the club." This, however, should surprise no one, because as everyone now acknowledges, the "club" *was* operating in a prohibited zone, i.e., one where by zoning law it could not function. So, of course, the club on E Street had to close. To quote Judge Moskowitz, "Poppell cannot rely on the erroneous issuance of Zoning Use Certificate Approvals in order to continue operating at the E Street location. If he is in fact in violation of the zoning ordinances *his club must cease to operate except where permitted by the zoning ordinances.*" [R & R p. 11]. This conclusion was not Filner's decree, or even Carr's, or the prosecutor's: it was the official legislative voice of the City of San Diego. By October 16, 1991, City officials had learned from their investigations that this zoning violation was an uncontroverted fact. The zoning counts unchallenged in *this* lawsuit of which Poppell was convicted in Municipal Court, Counts 2 and 4, adjudicated his *disentitlement* to remain at that address notwithstanding their subsequent fate in the petition for a writ of habeas corpus. The writ did not rezone the property. Carr was so informing City officials in August 1991. [R.T. 684–715].

Read in this light, which is the only light which this record permits, the Filner letter does not prove malice or an intent wrongfully to interfere with Poppell's business or any of his rights. The letter does not speak of driving Poppell out of business, only of closing his club.

Poppell did not call Filner as a witness even though Filner was on his witness list. Poppell's omission detracts from the interpretation he attempts to place on the letter. *See Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 520–21 (10th Cir.1987) (failure to call knowledgeable witnesses about the meaning of a document reflects on whether inferences to be drawn therefrom are reasonable).

## VI

### Equal Protection

█ Poppell claimed as part of his § 1983 theory, as the judge explained to the jury at the opening of the trial, that he had been knowingly "singled out for prosecution while others similarly situated were not prosecuted and that the ... decision to prosecute him was based on impermissible grounds." We have read every word of this record and find no substantial evidence whatsoever to support this claim. Poppell's attempt to show a discrepancy between himself and others "similarly situated" utterly failed. Carr admitted that she had "worked with" three other adult entertainment establishments who had been given mistaken permits and had not taken their cases to the City Attorney. But the record established conclusively that unlike Poppell's club these establishments-the F Street bookstores-had no previous violations on their records. Poppell did not attempt to dispute this dispositively relevant distinction, and he did not introduce evidence of a single instance where a repeat offender had been treated differently from his client. We can infer from this voluminous record that had such evidence existed, Poppell would have found and introduced it. In fact, Poppell's failure in this regard stands as substantial evidence that Poppell was not singled out, and, inferentially, that he was treated like all others similarly situated.

Poppell's attorney's mistake in this regard was to attempt to measure the Neighborhood Code Compliance Department's zoning treatment of Poppell against the entire universe of violators. However, Poppell, by virtue of the City Attorney's policy, was in a special class: repeat offenders. This was *not* Carr's policy, nor was it the policy of her department. In any event, the class of repeat zoning code violators is not a suspect or a quasi-suspect classification, and, thus, minimal scrutiny is appropriate. We hold that such a commonplace policy is reason-

ably related to the legitimate goal of deterring repeat zoning code violators. Under the circumstances, the district court erred in permitting this claim to go to the jury.

As to the broad allegation that the decision to prosecute Poppell was based on "impermissible grounds," again, the charging decision was *not* made by Carr, but by the City Attorney. The record is utterly devoid of any impermissible motive on Carr's behalf, as we have explained in our discussion of why his malicious prosecution theory fails. Poppell did not support his allegation that either Carr or the City-which had a policy to permit these businesses to operate-had singled him out for punishment because he sought to exercise any of the various constitutional rights on which he relied. Poppell's evidence is clearly not sufficient to sustain the jury's general verdict.[3]

## VII

### Due Process

Poppell's substantive due process claim was predicated on allegations that he had been the victim of a lawless campaign to drive him out of business. These allegations are inextricably intertwined with his other theories. As we have conclusively demonstrated in Parts IV and VI, however, he did not come forward with any evidence to support this claim. Moreover, he simply has no right to be free of the zoning codes duly established by the City of San Diego.

## VIII

### Summary

Reviewing this record with all deference to the jury's verdict and to the decisions of the trial judge, we are left with the unshakable conclusion that the case as to Carr was at best about an understandable bureaucratic mistake as to the Sunrise location, not malice

---

**3.** With no showing of malice sufficient to sustain an action for malicious prosecution, Carr's communications to the City Attorney would ordinarily be covered by section 47 of California's Code of Civil Procedure, which creates a privilege for communications made in the initiation or course of any proceeding authorized by law. *See Fre-* *mont Compensation Ins. Co. v. Superior Court,* 44 Cal.App.4th 867, 52 Cal.Rptr.2d 211 (1996); *Kimmel v. Goland,* 51 Cal.3d 202, 271 Cal.Rptr. 191, 793 P.2d 524 (1990). *Fremont* says that reports of criminal activity to police/prosecution are privileged, even if made of malice.

or any purpose to deprive Poppell of his constitutional rights. The evidence viewed in its light most favorable to Poppell together with all the inferences that may reasonably be drawn therefrom in support of his claims does not demonstrate or prove an unlawful purpose to ruin his business or to punish him for exercising his rights, only to enforce the law and to make him move to a legal location. This case does no more than describe the complications that arise from our form of government that separates various functions and then requires them to work together as they implement the rule of law. It is not the usual malicious prosecution case involving allegations of charges cooked up for improper reasons by private persons. The meshing of these gears is not always perfect, but the usual play in the criminal justice system does not suggest, without more, malice or foul play on the part of the various actors. The official nature of Carr's actions reflects negatively on the reasonableness of the inferences and conclusions Poppell seeks to draw from the evidentiary data. Here, the prosecutors even went so far as to secure a warrant before any inspection was accomplished. The return itself and the accompanying declarations establish beyond doubt a sound basis to take Poppell to court, which again, is just a normal step in the sorting out of these matters as contemplated by the rule of law upon which our system depends. Poppell's attempt to characterize the discharge of Carr's official responsibilities as the tort of malicious prosecution simply does not work. His claims are no more than "debater's suppositions." *Sunward*, 811 F.2d at 520–21.

## IX

### State Claims

California Government Code § 821.6 provides that a public employee is immune from liability for injuries caused by instituting or prosecuting any judicial or administrative proceedings, even if the employee acts maliciously and without probable cause. *See* Cal. Gov't Code § 821.6 (West 1994).

■ Carr enjoys immunity under state law for the actions Poppell claims resulted in damages. Section 821.6 provides that as a

public employee, Carr is immune from liability for injuries caused by instituting any judicial proceeding, even if she had acted with malice. *See Scannell v. County of Riverside*, 152 Cal.App.3d 596, 604, 199 Cal.Rptr. 644 (1984). Accordingly, Poppell's claim for negligent infliction of emotional distress must fail. Even if Carr had acted with malice, the jury would be precluded from finding liability on a state law claim of negligent infliction of emotional distress. The City of San Diego cannot be held liable for such acts where its employees are immune from liability. *See* Cal. Gov't Code § 815.2(b).

Furthermore, the remaining state claims, premised upon various California constitutional provisions, must also fail. Carr enjoys immunity under state law for any action which presumably caused Poppell to suffer damages—referring the case to the City Attorney's Office. Poppell's constitutional claims also must fail because the jury's general verdict did not differentiate between the emotional distress claim and the constitutional claims.

■ As a general rule, a general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury. *See Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29–30, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 62 F.3d 280, 285–86 (9th Cir. 1994). As we have decided, the jury's verdict on the federal claims against Carr and the City of San Diego, see Part X, was not supported by substantial evidence in the record. The state claim for negligent infliction of emotional distress is barred by California's statutory immunity provisions. The only remaining claim is founded upon state constitutional grounds and is similarly unavailing.

## X

### Liability of the City of San Diego

Although we reverse the determination by the jury with respect to appellant Sharren Carr, the issue of the City's liability remains. *See Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 889 (9th Cir.1990) (not-

ing the fact that individuals may be entitled to qualified immunity does not demonstrate that the City itself is not liable).

 Poppell contended in his fourth cause of action against the City of San Diego that it had an official policy or custom of inadequate training and supervision of its employees which caused the constitutional violations Poppell alleged were violated by Carr and the police officers.[4] The fact that Carr, as an individual appellant, is entitled to qualified immunity does not preclude liability for the City. *See id.*

The City is not eligible for a defense of qualified immunity. *See Kentucky v. Graham,* 473 U.S. 159, 166–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). In addition, the City cannot be held liable on a theory of respondeat superior. *See Thompson v. City of Los Angeles,* 885 F.2d 1439, 1443 (9th Cir.1989). The City could have been held liable if Poppell demonstrated that his constitutional rights were violated as a result of an official policy or custom. *See Monell v. Dep't of Social Serv.,* 436 U.S. 658, 690–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

 Poppell contended that the City's failure to give him advance warning of his violation of the zoning ordinance before serving him with a criminal warrant violated his right to equal protection of the laws. However, it was the policy of the City Attorney not to give administrative warnings to repeat violators of zoning or building ordinances. Poppell was a repeat offender. Such a policy does not contravene the Constitution. There is no evidence in the record that Poppell was treated any differently from other repeat violators. Therefore, there was no violation of Poppell's right to equal protection of the laws as a result of San Diego's official policy.

Fatal to Poppell's position, however, is the general verdict used in this case. With the demise of the entire case against Carr, the judgment against the City necessarily fails. We see no possible way to determine that the verdict against the City rested on considerations wholly separate from her conduct.

Thus, we reverse the judgment against the City.

REVERSED AND REMANDED WITH INSTRUCTIONS TO ENTER JUDGMENT IN FAVOR OF CARR AND FOR FURTHER PROCEEDINGS.

ALL COSTS AWARDED TO DEFENDANTS–APPELLANTS.

---

4. The jury found only three parties liable at trial: Zoning Administrator Carr, the three police officers, and the City of San Diego. The only parties who appeal the verdict are Carr and the City. The police officers do not appeal.